[Cite as *State v. Wall*, 2026-Ohio-2846.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JENO L. WALL,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 CO 0041

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2024 CR 651

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino*, Columbiana County Prosecutor, and *Atty. Ryan P. Weikart*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. James R. Wise*, for Defendant-Appellant.

Dated: July 23, 2026

**HANNI, J.**

{¶1} Defendant-Appellant, Jeno L. Wall, appeals from a Columbiana County Common Pleas Court judgment sentencing him to life in prison without parole plus 36 months in prison consecutive to that sentence. Appellant was convicted of aggravated murder, murder, firearm specifications, and intimidation of a witness.

{¶2} Appellant asserts the trial court erred by denying his motion to suppress a witness identification because the police failed to comply with photo line-up procedures. Appellant also contends the trial court committed plain error by allowing a detective to testify as an expert when he was not proffered or qualified as one. Appellant also contends there was insufficient evidence to convict him of aggravated murder and intimidation of a witness and these convictions were against the manifest weight of the evidence. He further maintains that cumulative errors in allowing inadmissible testimony denied him a fair trial.

{¶3} Appellant's assignments of error lack merit. While police improperly presented a single photo of Appellant to a witness and 33 minutes later presented a faulty photo array, these errors were acknowledged at trial and the trial court charged the jury with a special instruction relating to the photo identification. In addition, proffering and qualifying the detective who testified about cell phone extraction as an expert was not necessary because he provided lay testimony. Additionally, sufficient evidence supports Appellant's aggravated murder and intimidation of a witness convictions. Witnesses testified at trial that Appellant became increasingly agitated as he repeatedly searched for the victim, struck the victim with a gun when he found him, and shot the victim in the back while the victim was kneeling. Minutes after shooting the victim in front of witnesses, Appellant brandished his gun to one of the witnesses and threatened that the witness would be next if he said anything. Finally, Appellant was not denied a fair trial because no cumulative errors exist and other evidence supports his convictions.

## I.     RELEVANT FACTS AND PROCEDURAL HISTORY

{¶4} The Columbiana County Grand Jury indicted Appellant for: aggravated murder in violation of R.C. 2903.01(A) and murder in violation of R.C. 2903.02(A), both

unclassified felonies, with firearm specifications; and intimidation of a witness in violation of R.C. 2921.04(B)(2), a third degree felony.

{¶5} On July 29, 2025, Appellant filed a motion to suppress a witness identification based on a photo lineup that violated his due process rights. The court held a hearing, where Lieutenant Marsha Eisenhart of the Village of Wellsville Police Department testified. The trial court denied Appellant's motion.

{¶6} The jury trial began on September 23, 2025. The State presented 19 witnesses and Appellant testified as his sole defense witness.

{¶7} Trial testimony revealed the following relevant facts. On September 9, 2024 at 11:30 p.m., Wellsville Police Department dispatch received a call about shots fired at 10th and 504 Lisbon Street. (Trial Tr. 222-223). Officers Jeff Weekley and Shawn Bloor of the Wellsville Police Department searched the property, which was owned by James Howell, who was not home at the time. (Trial Tr. 227-228).

{¶8} As Officer Weekley reentered his cruiser, he noticed an individual lying face down on the ground with his hand raised. (Trial Tr. 228-229). Officer Bloor identified the individual as R.H. (Trial Tr. 229). R.H. did not respond to questions, but repeatedly stated his back hurt and he could not breathe. (Trial Tr. 229, 231). Officer Weekley noticed blood on R.H.'s mouth and radioed for an ambulance. (Trial Tr. 230).

{¶9} As they waited, Officer Weekley asked the victim what happened and who injured him, but the victim did not answer. (Trial Tr. 230). Eventually, the victim stated, "Oh, we were just playing around." (Trial Tr. 231). The victim stopped responding and emergency medical technicians arrived at the scene and discovered a gunshot wound on the victim's back. (Trial Tr. 232). The victim died a short time later.

{¶10} Officers secured the scene and persons of interest were identified as Brandon Kessler, Matt Hawkins, James Howell, and eventually Appellant. (Trial Tr. 237).

{¶11} James Howell testified that he and the victim, also known as Hubba, were close friends. (Trial Tr. 266-267). He related that R.H. and R.H.'s girlfriend, Tiffany Sattler, lived in his garage for a couple of months before the shooting. (Trial Tr. 266-268). He described the relationship between R.H. and Ms. Sattler as "toxic." (Trial Tr. 268). He asked them to move out a week before the shooting. (Trial Tr. 269).

{¶12} Howell testified that Appellant came to his trailer and helped R.H. and Ms. Sattler move out of his garage. (Trial Tr. 269). This was the first time he saw Appellant and Appellant told Howell he looked familiar. (Trial Tr. 270). Howell also observed that Appellant, R.H., and Ms. Sattler were picked up by someone driving a black truck with yellow fog lights. (Trial Tr. 271).

{¶13} Mr. Howell recalled that on September 9, 2024, his dog escaped and he went looking for her. (Trial Tr. 273). He noticed Ms. Sattler sleeping in his garage and a few hours later, R.H. appeared at his house. (Trial Tr. 273-274). Howell left when Ms. Sattler and R.H. began fighting in his garage. (Trial Tr. 275).

{¶14} Mr. Howell returned to his garage and R.H. and Matt Hawkins stopped by around 7:30 p.m. or 8:00 p.m. (Trial Tr. 277-278). He testified they "hung out" in the garage and his mom dropped off food. (Trial Tr. 278-279). He recalled Appellant stopped by a half an hour later, after everyone left, and stated he was looking for R.H. (Trial Tr. 279-280). Appellant stayed for 15 to 20 minutes, stated that R.H. "kept dogging Tiffany," and Appellant wanted to talk with R.H. (Trial Tr. 280-281).

{¶15} Mr. Howell testified Appellant acted differently than the previous visit and he thought Appellant was drunk. (Trial Tr. 281). He told Appellant R.H. was not there, but Appellant did not believe him. (Trial Tr. 282). Appellant ultimately left in the same truck with the same driver from the prior day. (Trial Tr. 282-283).

{¶16} Mr. Howell further testified that Appellant again returned, more agitated and jittery. (Trial Tr. 284). Appellant demanded Howell take him into his garage and trailer to search for R.H. (Trial Tr. 284). Appellant stumbled into the wall inside Howell's trailer. (Trial Tr. 284). Howell observed that Appellant was angry about his inability to find R.H. (Trial Tr. 285). Around 10:30 p.m., once Appellant left, Howell texted R.H. and told him Appellant and Brandon Kessler were looking for him. (Trial Tr. 285). Kessler's home is located in front of Howell's residence. (Trial Tr. 288).

{¶17} Mr. Howell testified that because he was scared and irritated with the situation, he holstered his .380 Smith & Wesson to his person. (Trial Tr. 287). He stated Appellant was aggressive and he was uncertain of the actions Appellant might take. (Trial Tr. 287). Howell related that 15 to 20 minutes later, Appellant and Kessler returned and began searching his garage for R.H., asking him if he saw R.H. (Trial Tr. 289). Howell

Case No. 25 CO 0041

thereafter sent another message to R.H., telling him Appellant and Kessler were looking for him as they walked toward Kessler's house.  (Trial Tr. 290).

{¶18}  Mr. Howell testified he returned to his garage when he heard a loud bang out front.  (Trial Tr. 290).  He stated Appellant and Kessler had found R.H. lying on the side of his garage next to a telephone pole.  (Trial Tr. 291).  Howell testified he was 10 feet away as he watched Appellant hit R.H. and yell at him to fight.  (Trial Tr. 291-292).

{¶19}  Mr. Howell testified that when R.H. did not get up and fight back, he saw Appellant pull out a gun from his waist and hand it to Kessler.  (Trial Tr. 292).  He watched Appellant choke R.H., retrieve the gun from Kessler, and strike R.H. with it.  (Trial Tr. 292).  He observed R.H. fall down, then Appellant point the gun at R.H. and shoot him.  (Trial Tr. 292).  He saw Appellant and Kessler then run towards 10th Street, while he remained in his driveway.  (Trial Tr. 293).  Howell did not pull out his gun as he was scared and not sure he could shoot someone.  (Trial Tr. 293).

{¶20}  Mr. Howell recalled Appellant telling him to come back as he was turning to walk back to his trailer.  (Trial Tr. 294).  Howell testified Appellant told him to tell police he did not know R.H. and he is a "crackhead" from the neighborhood.  (Trial Tr. 294).  Howell testified that as he turned to go into his trailer, he noticed his dog had escaped again and was chasing Appellant and Kessler down the street.  (Trial Tr. 294).  He walked to retrieve his dog and while he was at the edge of Kessler's yard, Appellant approached him, showed him the gun on his hip, and told him if he said anything, he would be next.  (Trial Tr. 295-296).

{¶21}  Mr. Howell ran to his sister's house.  (Trial Tr. 296).  He waited in her house for three hours until she arrived.  (Trial Tr. 298).  They then got into her car to leave, but were blocked in by the police.  (Trial Tr. 299).  Howell was taken to the police station, identified R.H., and told police Appellant shot R.H.  (Trial Tr. 300).

{¶22}  On cross-examination, Howell admitted the first two times he spoke with police, he did not tell them he was carrying a gun.  (Trial Tr. 306).  He testified he left the gun at his sister's house because the gun was stolen and he was on probation.  (Trial Tr. 313-314).

{¶23}  On re-cross examination, Howell confirmed he first described the shooter to police as a 5'9" to 6'0" black male with short hair.  (Trial Tr. 320).  He testified at the

station, police showed him a picture of Appellant and identified Appellant by name. (Trial Tr. 321). He stated the person in the picture shot R.H. (Trial Tr. 321). He did not know Appellant's name at that time, but knew his face. (Trial Tr. 321).

{¶24} Mr. Howell's sister testified she found Howell partially lying under her son's bed upstairs when she returned home between 1:30 a.m. and 2:00 a.m. on September 10, 2024. (Trial Tr. 326-328). She stated Howell was scared and told her a black man shot R.H. at his house, the man was a drug dealer, and Howell did not know his name, but saw him before. (Trial Tr. 328). She testified they got into her car to leave her home, but police cars blocked them from leaving. (Trial Tr. 330).

{¶25} Joshua Kersey testified he resided with K.G. in September 2024 where he met Appellant, whom he also knew as "Mally-Mall." (Trial Tr. 346). He was "partying" with Appellant and others on September 9, 2024 at K.G.'s house when Appellant left around 10:30 or 11:00 p.m. (Trial Tr. 347-348). He related Appellant returned at 12:45 a.m. or 1:00 a.m. with Ms. Sattler. (Trial Tr. 349). He testified Ms. Sattler and Appellant showered, washed their clothes, and she fell asleep. (Trial Tr. 350).

{¶26} Mr. Kersey testified someone later showed him a Facebook post stating R.H. had been murdered. (Trial Tr. 351). He did not realize a connection until someone told him R.H. was Ms. Sattler's boyfriend. (Trial Tr. 351). However, he recalled overhearing Appellant on the phone telling someone Ms. Sattler was the one and "whatever happened, it happened again." (Trial Tr. 352-353). He stated K.G. wanted Appellant and Ms. Sattler to leave, but they refused to do so. (Trial Tr. 353).

{¶27} On cross-examination, Kersey admitted he was "out of his mind" high that night. (Trial Tr. 358). He testified he and Appellant were arrested by police that night. (Trial Tr. 355). He had an outstanding warrant. (Trial Tr. 355). He and Appellant were taken in separate police cars and placed in different cells. (Trial Tr. 355).

{¶28} Codie Balser testified she met Appellant two days before the shooting. (Trial Tr. 361). She recalled sitting in K.G.'s bedroom with Appellant and Ms. Sattler when she received a text that R.H. died. (Trial Tr. 365). She showed it to Ms. Sattler, who did not react, but when she told Appellant, Ms. Sattler said something to him and they both began laughing. (Trial Tr. 366). She observed that Appellant became quiet and anxious once the information came out and he paced back and forth. (Trial Tr. 367).

Case No. 25 CO 0041

{¶29} Ms. Balser testified she left K.G.'s house around 5:00 a.m. because she had a bad feeling and questioned whether Appellant and Ms. Sattler had something to do with the shooting. (Trial Tr. 368). She further testified that she cleaned homes for a living and months later, she was cleaning between two garages on 10th Street when she discovered a steel casing near Mr. Howell's residence. (Trial Tr. 369). She contacted the police and they took the casing. (Trial Tr. 369).

{¶30} Joseph Savin testified he met R.H. a month before the shooting and he knew Brandon Kessler, also known as "Chico," because they helped each other find work and they would get high together. (Trial Tr. 380-382). He also met Appellant a month before the shooting and worked with him a couple of times. (Trial Tr. 382). He knew Appellant cared for Ms. Sattler. (Trial Tr. 384). Mr. Savin reported he helped Appellant move Ms. Sattler out of Howell's house on September 9, 2024. (Trial Tr. 385). He worked all day when he received a text stating that R.H. was at Kessler's house "acting crazy and attacking the house." (Trial Tr. 386). He drove his truck, a dark green Ford F-250 with "chicken lights" on top, to Kessler's house and saw Kessler standing outside saying he should not have to deal with the situation because it was his roommate's fault. (Trial Tr. 387-388).

{¶31} Mr. Savin contacted R.H. and told him not to tear up his belongings and R.H. agreed. (Trial Tr. 388). Savin then told Kessler that Appellant and R.H. did not get along, so they got Appellant to come to the house to diffuse the situation. (Trial Tr. 389). He messaged Appellant on Facebook and told him he was coming to get him to "hang out" and get high at Kessler's house. (Trial Tr. 390). Savin testified he and Kessler picked up Appellant and then returned to Kessler's house. (Trial Tr. 389-393).

{¶32} Savin testified that five minutes later, he saw Appellant walk out of the house and head toward Howell's trailer. (Trial Tr. 393). Savin got into his truck and picked up Appellant, telling him to get in and to stay at Kessler's house. (Trial Tr. 393, 395). The last time he saw Appellant was in Kessler's yard talking to Kessler. (Trial Tr. 396). Mr. Savin recalled that Appellant then asked him for a ride home and he dropped Appellant and Ms. Sattler in the parking lot of Pep Minimart. (Trial Tr. 398). He returned to Kessler's house and then drove Kessler back to the gas station to get more drinks.

(Trial Tr. 399). He observed Kessler's demeanor as "pretty normal," but noted "everyone was high on methamphetamines, so normal is kind of weird." (Trial Tr. 400).

**{¶33}** Patrolman Caden Weekley testified police located Appellant and took him to the police station for an interview. (Trial Tr. 429). He testified that Appellant stated he had been at K.G.'s house, but he denied being on 10th Street that night. (Trial Tr. 433). He also denied knowing Kessler and Savin. (Trial Tr. 433-434). He described Ms. Sattler as his best friend. (Trial Tr. 434-435). He also knew Hubba was Ms. Sattler's boyfriend. (Trial Tr. 434).

**{¶34}** Patrolman Weekley described Appellant as protective of Ms. Sattler, stating she had nothing to do with anything and she was with him all day. (Trial Tr. 435). Appellant admitted abusing drugs at K.G.'s house, including methamphetamine, and he was "high as hell." (Trial Tr. 441). Appellant reported R.H. was beating Ms. Sattler and she was crying and had marks on her neck. (Trial Tr. 442). Appellant admitted he was very angry, and then admitted he was at K.G.'s house on September 9, 2024, and Savin, who was his boss, had taken him and Ms. Sattler to the gas station in a blue or green truck with orange lighting. (Trial Tr. 444).

**{¶35}** Patrolman Weekley further testified that Appellant suggested R.H. died from an overdose and then later stated that R.H. was not dead. (Trial Tr. 446). He also asked who was talking to the police and stating that he had murdered R.H. (Trial Tr. 446). Appellant told Patrolman Weekley they were lying and stated that he was "going to beat their ass with my bare hands." (Trial Tr. 446). Patrolman Weekley recalled that Appellant became very agitated when they discussed bringing Ms. Sattler in for questioning. (Trial Tr. 447). He also recalled Appellant saying to himself, "Whoever's snitching is going to get dealt with." (Trial Tr. 448).

**{¶36}** On cross-examination, Patrolman Weekley indicated that Appellant appeared to be under the influence of drugs during the first interview. (Trial Tr. 452). He did not recall a discussion about chemical testing to see if Appellant had fired a firearm and he advised that no one present at K.G.'s house on the night of the shooting was interviewed at that time. (Trial Tr. 453-456). Patrolman Weekley did not recall finding any evidence of drug use at K.G.'s house. (Trial Tr. 456).

{¶37} Dr. Alison Krywanczyk performed the autopsy on R.H. for the Columbiana County Coroner's Office on September 10, 2024. (Trial Tr. 464-466). She stated Appellant sustained a gunshot wound to the back that traveled near his right shoulder, down to his right rib, right lung and into the abdominal cavity. (Trial Tr. 471). It injured his diaphragm, fractured a vertebrae in his spinal column, injured his small intestine, and struck major blood vessels in his stomach and aorta. (Trial Tr. 471-472).

{¶38} She testified the unusual trajectory of the projectile could be consistent with R.H. kneeling and the shooter positioned above him. (Trial Tr. 474). She also noted R.H. had blunt force injuries on his face and knees, as well as abrasions and contusions. (Trial Tr. 476-477). She concluded R.H. died from a gunshot wound to the back and the manner of death was homicide. (Trial Tr. 489, 492). On cross-examination, she opined it was possible from the bullet trajectory that R.H. also could have been shot while sitting in a chair. (Trial Tr. 493). She confirmed a toxicology report showed R.H. had amphetamine, methamphetamine, nicotine, cocaine metabolite, and alcohol in his system. (Trial Tr. 497-498).

{¶39} Ohio BCI Agent Andrew Chappell testified he analyzed a fired bullet found on the scene and a report was prepared by National Integrated Ballistic Information Network Lab Technician Patrick Murphy, who concluded that the caliber of the casing was a 9-millimeter Luger. (Trial Tr. 517-523). He stated on cross-examination that no gun was analyzed as one was not submitted. (Trial Tr. 524-525).

{¶40} Detective Daniel Haueter of the East Palestine Police Department testified he had certifications in extraction that included Secureview/Datapilot software forensic system, Cellebrite forensic system, smartphone analysis, and physical analysis. (Trial Tr. 529-530). The certifications showed his training in extraction, which is the transfer of data from a mobile phone to a particular system. (Trial Tr. 530). He explained he was also trained in analyzation, which is looking at the data and details from the extraction. (Trial Tr. 530).

{¶41} Detective Haueter testified he assisted the police in extractions from various electronic devices relating to the shooting. (Trial Tr. 544). He analyzed James Howell's BLU model cellular device which yielded a Facebook Messenger message between R.H. and James Howell. (Trial Tr. 546-548). He indicated that exchanges occurred Monday,

September 9, 2024 at 12:30 a.m., 7:30 p.m. and 11:20 p.m. (Trial Tr. 548). He read the 11:20 p.m. message to the jury, in which Howell told R.H. to stop by his house and warned that Chico and the person who picked up Appellant and Ms. Sattler in the truck were looking for him and thought he was hiding at Howell's house. (Trial Tr. 548). He told R.H. to get there and "handle it" and indicated they wanted to talk to him and would be at Kessler's house. (Trial Tr. 548).

{¶42} Detective Haueter further testified he analyzed Appellant's iphone, which showed an extraction indicating that two hours after the shooting, Appellant texted Joseph Savin and stated he left a hoodie in Savin's truck. (Trial Tr. 582). The text stated that the hoodie was "the dirty one I should worry about." (Trial Tr. 584).

{¶43} Brandon Kessler testified he lived on 10th Street at the relevant time with his roommate J.L. and he was testifying in cooperation with a plea agreement. (Trial Tr. 608-609). He worked on September 9, 2024 and arrived home that evening. (Trial Tr. 610). J.L.'s girlfriend was there when he arrived, but J.L. was not. (Trial Tr. 610).

{¶44} Kessler was a friend of R.H. and R.H. and Ms. Sattler lived with him for a few months prior to the shooting. (Trial Tr. 611). He related the two also had lived with James Howell and Howell's house was half a block away from his. (Trial Tr. 612).

{¶45} Mr. Kessler testified that when he arrived home, J.L.'s girlfriend told him R.H. and Anthony Powell were coming to the house to fight J.L. and she called Joseph Savin to come to the house. (Trial Tr. 613-614). Kessler said when Savin appeared, he and Kessler went for a ride in Savin's truck, as they often did. (Trial Tr. 614-615). Kessler related he did not know where they were going until they picked up Appellant, whom he did not know at the time. (Trial Tr. 617).

{¶46} Mr. Kessler indicated they drove back to his house and he went inside, while J.L. and Ms. Sattler stayed in the driveway. (Trial Tr. 619). When Kessler went back outside, he saw Appellant, J.L., and Ms. Sattler talking. (Trial Tr. 619). He overheard Appellant asking Ms. Sattler where R.H. was. (Trial Tr. 620).

{¶47} Mr. Kessler testified he and Appellant then walked over to James Howell's house to look for R.H. because Kessler was looking for a watch R.H. stole from him. (Trial Tr. 620-621). They looked around at Howell's house, and asked him if he saw R.H. (Trial Tr. 621). Howell told them he had not seen R.H., so Kessler and Appellant returned to

Kessler's house.  (Trial Tr. 621).

**{¶48}**  Mr. Kessler testified he walked back into his house and Appellant was back at the side field beside his house.  (Trial Tr. 622).  The two then returned to Howell's house to look for R.H.  (Trial Tr. 622).  Kessler related he was not sure why Appellant was looking for R.H., but he knew Appellant had spoken to Ms. Sattler and knew she was fighting with R.H.  (Trial Tr. 622).

**{¶49}**  Mr. Kessler found a black drawstring bag hanging on the gate around the right side of the front of James Howell's garage.  (Trial Tr. 623).  He "hollered" to Appellant that he found R.H.'s bag, and he saw Appellant on Lisbon Street near the front of the garage.  (Trial Tr. 623).   Appellant walked back towards him, still looking around, and Kessler and Howell walked from the front of the garage to where the gate was located, and saw that Appellant had found R.H. there.  (Trial Tr. 624).

**{¶50}**  Mr. Kessler testified R.H. must have been hiding there and as he and Howell came around the corner, they saw that Appellant had R.H. down on his knees.  (Trial Tr. 625).  He recalled hearing Appellant tell R.H. to stand up, but as R.H. tried to do so, Appellant hit him in the mouth with a gun.  (Trial Tr. 625).  He then saw Appellant pull the trigger and shoot R.H.  (Trial Tr. 625).  Kessler stated he turned around and ran.  (Trial Tr. 625).  He heard R.H. say, "You shot me" to Appellant.  (Trial Tr. 626).

**{¶51}**  Mr. Kessler testified he ran back to his house and Appellant ended up there as well.  (Trial Tr. 626).  He indicated he got a good look at the gun and it was a black and silver .9 millimeter pistol.  (Trial Tr. 626-627).  He went upstairs and heard Joseph Savin and Appellant come in and they gave him the gun, which was in a Crown Royal bag.  (Trial Tr. 627-628).  Appellant told Kessler that Savin would be back to take him to get rid of the gun.  (Trial Tr. 628).  He saw Appellant, Savin, and Ms. Sattler leave in the truck together.  (Trial Tr. 628).

**{¶52}**  Savin thereafter returned to pick up Kessler and Kessler testified he threw the gun in the river at Riverside.  (Trial Tr. 628).  He was scared he was going to be killed. (Trial Tr. 629).  Savin then drove him to the store to get cigarettes and a Dr. Pepper, and then dropped him off at home.  (Trial Tr. 629).  The police arrived at his house, but he did not answer his door as he was scared and trying to process the situation.  (Trial Tr. 629).

Case No. 25 CO 0041

{¶53} Mr. Kessler testified he spoke to police on September 10, 2024 and was not completely honest when he told them he did not know the "black guy" that shot R.H. (Trial Tr. 630). He also failed to tell police he threw the gun in the river. (Trial Tr. 631). He said he was afraid either he or his family would be killed. (Trial Tr. 632). He spoke to police three additional times.

{¶54} Mr. Kessler indicated that since he has been in jail, Appellant threatened him and his children. (Trial Tr. 632). He reported the threats to jail personnel. (Trial Tr. 633). He identified Appellant as the person who killed R.H. (Trial Tr. 632).

{¶55} On cross-examination, Kessler explained he and R.H. were friends at one time, but at the time of the shooting, they were not because R.H. stole from him and pulled a gun on his girlfriend when trying to break into his house. (Trial Tr. 637). He denied he pulled a gun on R.H. a week prior to the shooting. (Trial Tr. 637).

{¶56} Mr. Kessler also acknowledged Howell usually carried a gun, but he said he did not see it on him the night of the shooting. (Trial Tr. 642). He testified he saw Howell's gun in Appellant's hand after the shooting when Appellant came to his house to give him the gun Appellant used to kill R.H. (Trial Tr. 642-643). Kessler clarified that Appellant's gun was in the Crown Royal bag, and Appellant had Howell's gun in his hand when he gave Kessler his gun in the Crown Royal bag. (Trial Tr. 644).

{¶57} Mr. Kessler acknowledged he did not tell police the entire truth about September 9, 2024. (Trial Tr. 645). He explained he was scared for himself and his children. (Trial Tr. 645). He did tell police he disposed of the murder weapon when he requested an interview on January 29, 2025. (Trial Tr. 646). He first stated he did not know why he requested the interview, but then admitted he was hoping to get a better deal from the State as he faced obstruction charges. (Trial Tr. 647).

{¶58} Mr. Kessler opined that Joseph Savin and Ms. Sattler created the scheme to kill R.H. (Trial Tr. 648). He admitted R.H. stole thousands of dollars of tools and appliances from him and trashed his house. (Trial Tr. 650). He denied having any romantic involvement with Ms. Sattler, but stated J.L. did. (Trial Tr. 650). He acknowledged Ms. Sattler came to stay with him after R.H.'s death and she then went to live with James Howell. (Trial Tr. 651-652).

**{¶59}** An investigator for the Wellsville Prosecutor's Office testified he reviewed video surveillance collected by the Wellsville Police Department from five places in the neighborhood where the shooting occurred. (Trial Tr. 705-706). The prosecution used the videos and the investigator's review of the videos to support the testimony of its witnesses as to Appellant's actions and locations on the night of the shooting.

**{¶60}** An inmate from the Columbiana County Jail testified he knew Appellant because he was in the jail when Appellant was placed there for this case. (Trial Tr. 772). He related that Appellant offered him $3,000 and "90 grams of ice," or methamphetamine, if he told police it was James Howell who shot R.H. (Trial Tr. 772-773). The inmate acknowledged Joseph Savin was his wife's nephew. (Trial Tr. 779).

**{¶61}** Lieutenant Eisenhart of the Wellsville Police Department testified she responded to the shooting and reviewed items found at the scene, including glasses found lying near R.H. (Trial Tr. 789-794). She also noted a knife lying near his body, two flashlights, makeup and hair ties, but said they had no significance to the murder. (Trial Tr. 794, 799).

**{¶62}** She stated she was familiar with R.H. and knew Ms. Sattler was his girlfriend, he was a friend of James Howell, and Brandon Kessler lived across the street. (Trial Tr. 800-801). She also knew R.H. and Kessler accused each other of stealing, and were afraid the other would steal his girlfriend. (Trial Tr. 801). She recalled a police call a month before the shooting in which R.H. was accused of pulling a gun on Kessler. (Trial Tr. 801-802). Charges were filed against R.H. (Trial Tr. 802).

**{¶63}** Lieutenant Eisenhart outlined the instant investigation. (Trial Tr. 801-805). She testified that police identified "Mally" as an individual about whom they had received complaints prior to the shooting. (Trial Tr. 812). She received information that Ms. Sattler was associating with a male from Detroit whose street name was Mally. (Trial Tr. 805). An officer found Mally on Facebook and sent the photo to Lieutenant Eisenhart's cell phone. (Trial Tr. 812). She showed Howell the Facebook photo. (Trial Tr. 812). Howell responded, "yeah, that's him" when she showed him the photo. (Trial Tr. 813). Police later determined Appellant's name and his nickname. (Trial Tr. 813).

**{¶64}** Lieutenant Eisenhart testified that about 35 minutes after showing Howell the Facebook photo, she presented him a photo lineup, which did not include the

Facebook photo. (Trial Tr. 814). Howell identified Appellant from the lineup. (Trial Tr. 814). She knew Howell had interactions with Appellant prior to the shooting. (Trial Tr. 814). Lieutenant Eisenhart interviewed Howell a second time and this interview was consistent with the shooting. (Trial Tr. 816). She interviewed Kessler the following day and he was nervous, but cooperative. (Trial Tr. 817). He told her about the shooting, which was similar to the facts Howell told her, which was that a black male in a light-colored hoodie shot R.H. (Trial Tr. 818). She interviewed Kessler additional times and his description of the shooter did not change. (Trial Tr. 819).

{¶65} Lieutenant Eisenhart reviewed video footage and devices found at the scene. (Trial Tr. 835-843). She submitted the devices to Detective Haueter for extraction and thereafter received extraction reports. (Trial Tr. 844). She also received information the next day that Appellant was at K.G.'s house and when she drove there, Appellant, Ms. Sattler, Josh Kersey, K.G., and Anthony Vaughn were present. (Trial Tr. 845). Appellant was taken into custody. (Trial Tr. 846).

{¶66} A search of K.G.'s residence yielded a cream-colored jacket that was sent to BCI, but it contained no gunshot residue. (Trial Tr. 848-849). Lieutenant Eisenhart speculated the jacket may have been laundered as a text message between Joseph Savin and Appellant stated Appellant was worried about the dirty hoodie in Savin's backseat. (Trial Tr. 851). A gunshot residue test was not performed on Appellant because 12 hours had passed since the shooting. (Trial Tr. 852-853).

{¶67} Lieutenant Eisenhart stated she had watched the recording of Appellant's first interview and observed he was agitated, rocking back and forth, and appeared to be under the influence. (Trial Tr. 855). She interviewed Appellant on October 30, 2024 and he told her he was in the alley by the football field near K.G.'s house on the night of the shooting. (Trial Tr. 857). He denied ever having been on 10th or Lisbon Street, stated he did not know Kessler or Howell, and told her he had heard of Savin. (Trial Tr. 858).

{¶68} Lieutenant Eisenhart testified that Appellant then stated he knew Savin as he worked with him a few times. (Trial Tr. 866). He also told her he was irritated and had taken methamphetamine, although he thought it was "Mally" [sic]. (Trial Tr. 866). He told her he was "fried" when police took him into custody, but remembered the whole day before. (Trial Tr. 867). He stated he was at K.G.'s the entire day and waited for Ms.

Case No. 25 CO 0041

Sattler at the football field, where she met him. (Trial Tr. 867). He also stated he was at the gas station with Ms. Sattler and Savin. (Trial Tr. 867-868).

{¶69} According to Lieutenant Eisenhart, Appellant told her R.H. overdosed and then he offered to help solve R.H.'s murder, stating he wanted to clear his name. (Trial Tr. 869-871). He told her he knew R.H. was assaulting Ms. Sattler and said he did not care, but would do something if it happened in front of him. (Trial Tr. 871-872). He told her he loved Ms. Sattler, although she could push his buttons. (Trial Tr. 872). He also told her he wore all black on September 9, 2024, even though she observed from the video recording at the gas station that he wore a light-color shirt. (Trial Tr. 870-871).

{¶70} Lieutenant Eisenhart also spoke to Appellant's jailmate who stated Appellant offered him drugs if he would say that James Howell shot R.H. (Trial Tr. 873). She also affirmed she had investigated every lead in the case and nothing pointed to anyone except Appellant as the person who shot R.H. (Trial Tr. 873-874).

{¶71} On cross-examination, Lieutenant Eisenhart described the photo lineup procedure. (Trial Tr. 877). She stated she put the suspect's picture in OHLEG, Ohio's computer system, and OHLEG's wizard generated pictures that had the same characteristics as the suspect. (Trial Tr. 877). She explained that a blind administrator, or a person not connected to the investigation, is supposed to present the photographs to the witness, but that was not done in the instant case. (Trial Tr. 877). The photos generated by OHLEG, along with the suspect's photo, are placed in separate folders and presented to the witness, which she also did not do. (Trial Tr. 878-879). The witness is to view each photo individually and then indicate when he sees each individual photo whether that is the individual or not. (Trial Tr. 879).

{¶72} Lieutenant Eisenhart explained that when a blind administrator is not used, a written summary is necessary to explain why it was not done. (Trial Tr. 878). She acknowledged she did not write a summary. (Trial Tr. 878). She also admitted she gave Howell one sheet with six photographs on it rather than separate folders. (Trial Tr. 879). She further admitted she probably should not have shown Howell the Facebook photo of Appellant before the photo lineup. (Trial Tr. 880).

{¶73} Lieutenant Eisenhart also confirmed that the only description of the gun used to shoot R.H. was identified by Kessler, who admitted disposing of the gun, and the

flashlights she deemed insignificant found at the scene belonged to Howell. (Trial Tr. 882-884). She confirmed neither Howell nor Kessler were tested for gunshot residue, although they were interviewed within hours of or the day after the shooting. (Trial Tr. 885). She stated Appellant offered his fingerprints for testing when he was interviewed. (Trial Tr. 886).

{¶74} Lieutenant Eisenhart acknowledged the photo lineup procedure was not followed because the police department is small. (Trial Tr. 903). She noted the lineup procedure is not mandatory and the issue is the reliability of the identification. (Trial Tr. 903).

{¶75} Appellant testified. He acknowledged he was placed in Community Corrections Association in Youngstown and left without permission because he did not believe his blood sugar was managed properly. (Trial Tr. 933). He went to live with his sister and met Ms. Sattler through a friend. (Trial Tr. 933). He stated while they were close friends, they were not romantically or intimately involved. (Trial Tr. 933-934). He left his sister's house after they got into an argument. (Trial Tr. 934).

{¶76} Appellant was at K.G.'s house on the day of the shooting, where he, Kersey, K.G., and Ray played videogames, smoked marijuana, and consumed methamphetamines. (Trial Tr. 935-936). Ms. Sattler came over and they talked about her problems with R.H. as R.H. found out she was having "relations" with J.L., Mr. Howell, and an unknown person. (Trial Tr. 938-939). They talked for a while, and then she left to go buy drugs after talking with Joseph Savin and R.H. (Trial Tr. 939).

{¶77} Appellant testified he left K.G.'s house around 10:00 p.m. and walked to his girlfriend's house, saw no car in her driveway, so he walked to his sister's house through an alleyway because he had an outstanding warrant. (Trial Tr. 939-940). He saw his sister's truck was not in her driveway, so he went to Independent Square to see if his girlfriend was there, but she was not. (Trial Tr. 941).

{¶78} Appellant testified he rolled a marijuana cigarette and stayed at the basketball court nearby. (Trial Tr. 941-942). He then walked to his sister's house again and sat in her truck rolling another marijuana cigarette. (Trial Tr. 942). He went for another walk and was returning to K.G.'s house when he saw Ms. Sattler. (Trial Tr. 943). He estimated the time was 11:00 p.m. (Trial Tr. 944).

{¶79} Appellant related Ms. Sattler was upset about R.H. breaking her phone and talking about her. (Trial Tr. 944). Appellant gave her his phone and Ms. Sattler left, heading toward 18th Street, and he went down by the river to smoke more marijuana. (Trial Tr. 945-946).

{¶80} Appellant recalled speaking with R.H. on the day of the shooting, but said he did not text with him. (Trial Tr. 987). He said Ms. Sattler used his phone and was texting R.H., acting like she was Appellant. (Trial Tr. 988). He stated Ms. Sattler did this often and she would send threats to the men she was dating. (Trial Tr. 992).

{¶81} Appellant denied killing R.H. (Trial Tr. 1005). He stated he had broken up fights between R.H. and Ms. Sattler in the past, and R.H. was not wrong in reacting to some of the things Ms. Sattler did. (Trial Tr. 1015). He stated he was wearing all black with a beige jacket on the night of the shooting and he did not own a white hoodie. (Trial Tr. 1016).

{¶82} Appellant testified he told Patrolman Caden Weekley he was going to "whoop their ass" of whomever was lying about him. (Trial Tr. 1033). He was angry that people lied about the murder and he would use his hands to hurt those people, not a weapon. (Trial Tr. 1034). Appellant offered his phone, his fingerprints, and his DNA to the police because he did not murder or plot to murder R.H. (Trial Tr. 1040, 1046). He stated everyone was lying, except him. (Trial Tr. 1040). He explained Ms. Sattler was using his phone to message and FaceTime R.H. and asked him if he wanted to come and smoke with them. (Trial Tr. 1044).

{¶83} On September 29, 2025, the jury convicted Appellant on all charges. The trial court sentenced Appellant to life in prison without parole on the aggravated murder conviction, with which the murder conviction merged. The court further sentenced Appellant to 36 months in prison on the intimidation conviction with sentences to run consecutively.

{¶84} Appellant filed the instant appeal, asserting four assignments of error. In his first assignment of error, Appellant asserts:

**THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF JIMMY HOWELL REGARDING THE IDENTIFICATION OF THE DEFENDANT.**

{¶85} Appellant complains the trial court erred by denying his motion to suppress James Howell's testimony and his identification of Appellant at the photo lineup and at trial. He submits that Lieutenant Eisenhart improperly showed Howell a single photo of Appellant from Facebook before she showed him the photo array. He contends she also failed to comply with R.C. 2933.83 because she did not use the folder system required in the statute and she did not use a blind administrator or provide a written explanation for not using one.

{¶86} Appellant acknowledges both the prosecution and Lieutenant Eisenhart admitted at trial that she did not use a blind administrator or the proper folder system as required by statute. He also agrees the trial court issued a specific instruction to the jury as to R.C. 2933.83.

{¶87} However, Appellant contends Lieutenant Eisenhart's actions were impermissibly suggestive. He explains the only description she had of the suspect was a black male with short hair who was 5'9" or 6' tall. He asserts that after Lieutenant Eisenhart showed Howell the single Facebook photo, Howell reported he was only 80% sure the person pictured was the shooter. Appellant submits that minutes later, Lieutenant Eisenhart showed Howell a photo array that did not comply with R.C. 2933.83 so that he could simply pick out the person that matched the photo she showed him only minutes before.

{¶88} Appellee concedes Lieutenant Eisenhart did not follow R.C. 2933.83(A) by not using a blind administrator, failing to explain in writing her reasons for not doing so, and printing all six generated photographs on one sheet for Howell to review rather than separating them and placing each into a folder. However, Appellee asserts the Facebook photo was not impermissibly suggestive because Howell first stated he knew the shooter, provided a physical description of Appellant, and said he had a "stupid" nickname. Appellee continues that Howell also reported he saw Appellant before the shooting. Appellee further asserts the description Howell provided matched a person law enforcement knew and Lieutenant Eisenhart used the Facebook photo to confirm it was the same person. Appellee maintains that Howell confirmed that the person in the Facebook photo was the shooter and then Lieutenant Eisenhart created the OHLEG system photo array. Appellee concludes that the identification is reliable because Howell

Case No. 25 CO 0041

testified that he had been in close proximity with Appellant many times and Appellant had threatened him right after the shooting.

{¶89} Alternatively, Appellee submits that even if the court should have suppressed Howell's identification, it was harmless error because other substantial evidence would have resulted in Appellant's conviction. Appellee cites Kessler's testimony that Appellant shot Hubba in front of him, Savin's testimony that he transported Appellant to and from the scene, Appellant's denials to the police about being at the scene, the testimony from a prior person jailed with Appellant who testified that Appellant tried to bribe him to identify Howell as the shooter, and the threats Appellant made in front of police about hurting the people who "snitched" on him.

{¶90} In reviewing a ruling on a motion to suppress, we must determine whether competent, credible evidence supports the trial court's findings. *State v. Williams*, 2024-Ohio-943, ¶ 43 (7th Dist.). This standard of review is appropriate as, "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *Id.*, quoting *State v. Venham*, 96 Ohio App.3d 649, 653 (4th Dist. 1994). An appellate court accepts the trial court's factual findings and relies upon its ability to assess witness credibility, but we independently determine, without deference to the trial court, whether the trial court applied the appropriate legal standard. *Williams* at ¶ 43, citing *State v. Rice*, 129 Ohio App.3d 91, 94, (7th Dist. 1998). We will not disturb a trial court's decision on a motion to suppress when supported by substantial credible evidence. *Id.*

{¶91} R.C. 2933.83 sets forth the minimum requirements for photographic lineup procedures. It includes a folder system, filler photographs that resemble the suspect's description, blank photographs, a blind or blinded administrator, and documentation. R.C. 2933.83(C)(1) provides that evidence of a law enforcement agency's failure to comply with the procedure may be considered by the court in adjudicating a motion to suppress eyewitness identification resulting from that lineup.

{¶92} R.C. 2933.83(B)(1) provides that "a blind or blinded administrator shall conduct the live lineup or photo lineup." R.C. 2933.83(A) contains the following definitions of words used in the minimum requirements for lineup procedures:

(1) "Administrator" means the person conducting a photo lineup or live lineup.

(2) "Blind administrator" means the administrator does not know the identity of the suspect. "Blind administrator" includes an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system.

(3) "Blinded administrator" means the administrator may know who the suspect is, but does not know which lineup member is being viewed by the eyewitness. "Blinded administrator" includes an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system.

**{¶93}** R.C. 2933.83(B)(1) provides that a blind or blinded administrator should conduct the photo lineup. R.C. 2933.83(B)(2) states that the administrator shall state in writing the reasons for the impracticability of using a blind or blinded administrator.

**{¶94}** R.C. 2933.83(A)(6) outlines the procedure for the folder system, which is used to conduct the photo lineup. The procedure entails a number of steps, including using separate numbered folders for each photo in the photo array and presenting it to the witness. R.C. 2933.83(A)(6)(a)-(f).

**{¶95}** In addition, the Second District Court of Appeals has explained:

Courts have held that where only one photo is shown, R.C. 2933.83 does not apply. *State v. Lennon*, 8th Dist. Cuyahoga No. 104344, 2017-Ohio-2753, ¶ 53, citing *State v. Miller*, 11th Dist. Lake No. 2011-L-111, 2012-Ohio-3515, ¶ 37; *State v. Glenn-Coulverson*, 2017-Ohio-2671, 90 N.E.3d 243, ¶ 54 (10th Dist.). In that situation, the issue is whether a defendant's due process rights were violated due to the procedure used for identification. *Lennon* at ¶ 54. As noted, "[d]ue process may require a court to suppress eyewitness testimony when the identification results from an unduly suggestive identification procedure." [*State v.*] *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 208, citing *Foster* [*v. California*]*, 394 U.S. [440] at 442, 89 S.Ct. 1127, 22 L.Ed.2d 402.

*State v. McShann*, 2019-Ohio-4481, ¶ 70 (2d Dist.)

**{¶96}** When determining the admissibility of eyewitness identification, the trial court uses a two-step test:  the court determines whether the identification procedure was unduly suggestive.  *State v. Royal*, 2014-Ohio-1175, ¶ 27 (7th Dist.), citing *Neil v. Biggers*, 409 U.S. 188, 196-197 (1972).  A photo lineup is unduly suggestive if it "steers the witness to one suspect, independent of the witnesses' honest recollection."  *State v. Adams*, 2015-Ohio-3954, ¶ 208.

**{¶97}** If the procedure was unduly suggestive, we then determine if the identification is reliable under all of the circumstances, even if it was suggestive.  *Id.*  If the procedure is not unduly suggestive, we need not proceed to the second prong.  *State v. Hopkins*, 2021-Ohio-4632, ¶ 29 (7th. Dist.), citing *State v. McCrary*, 2014-Ohio-1468, ¶ 53 (7th Dist.) (citing *State v. Gross*, 2002-Ohio-5524, ¶ 19, *State v. Murphy*, 91 Ohio St.3d 516, 534 (2001)).

**{¶98}** In *Biggers*, 409 U.S. at 196-197, the United States Supreme Court outlined the factors to consider in evaluating the likelihood of misidentification.  Those factors include:  (1) the opportunity a witness had to view the criminal at the time of the crime; (2) the degree of attention paid by the witness; (3) the witness' accuracy in describing the criminal previously; (4) the witness' level of certainty; and (5) the length of time that elapsed between the crime and the confrontation.  *Id*.

**{¶99}** In the instant case, Lieutenant Eisenhart made a number of errors under R.C. 2933.83.  She presented Howell with a single Facebook photo of Appellant, and then 33 minutes later, presented him with a six-photo array which included Appellant.  She failed to use a blind or blinded administrator and failed to provide a written reason explaining why it was impracticable to use.  She also failed to present the OHLEG photos in separate numbered folders, choosing instead to place all six photos on one page to show Howell.

**{¶100}** At the suppression hearing, the State conceded Lieutenant Eisenhart's failures.  (Supp. Tr. 7).  However, the State cited *Biggers* and submitted that the factors outlined therein weighed heavily against finding unreliability of the identification.  (Supp. Tr. 8).  Lieutenant Eisenhart also testified both at the suppression hearing and trial to her many failures.  She admitted she probably "shouldn't have done that," when defense

counsel asked if she showed the single Facebook photo to Howell during his interview. (Trial Tr. 880).

**{¶101}** Based on these numerous failures and the State's concessions, we find the identification procedure was unduly suggestive. We must now determine if the identification is reliable under all of the circumstances, even though it was unduly suggestive.

**{¶102}** Evaluating the *Biggers*' factors, we find the identification is reliable under the totality of the circumstances. First, Howell had a solid opportunity to view Appellant at the time of the crime. He testified he saw Appellant make R.H. kneel, saw Appellant hit R.H. with the gun, and saw Appellant shoot R.H. Howell even took police back to the scene to recount the shooting. Howell was initially vague in describing Appellant to police, but it appears he did so out of fear for himself and his family rather than inability. Howell also met Appellant one week before the shooting when Appellant came with Joseph Savin to pick Ms. Sattler and R.H. up from Howell's garage after Howell kicked out Ms. Sattler and R.H. Howell also saw Appellant three or four times on the day of the shooting when Appellant repeatedly appeared at his home to search for R.H. Howell's level of certainty also appeared strong since he was able to provide a description of the shooter, stating that the shooter had a "stupid" nickname, subsequently picking Appellant out of the photo array. Finally, the time between the shooting and the identification was within hours, which further lends itself to reliability.

**{¶103}** For these reasons, we find that while Howell's identification was unduly suggestive, it was nevertheless reliable under the totality of the circumstances.

**{¶104}** Accordingly, Appellant's first assignment of error lacks merit and is overruled.

**{¶105}** In his second assignment of error, Appellant asserts:

**THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF DETECTIVE HAUTER [sic] AS TO THE EXTRACTIONS OF THE CELL PHONES AS HE WAS NOT QUALIFIED TO PROVIDE HIS TESTIMONY.**

**{¶106}** Appellant contends Detective Haueter testified as an expert about cell phone extractions, but he was never identified, proffered, or qualified as an expert. Appellant cites Evid.R. 702 and submits that Detective Haueter testified as an expert even

though he stated he did not know how the process worked. Appellant also contends that the trial court failed to apply the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) to determine whether the expert testimony was based on the scientific method. Acknowledging that trial counsel failed to object to Detective Haueter's testimony, Appellant submits a plain error standard of review applies and the admission of the text messages and phone calls testified to by Detective Haueter substantially affected the outcome of the trial.

{¶107} Appellant's counsel did not object to the State's failure to qualify Detective Haueter as an expert witness under Evid.R. 702. (Trial Tr. 528-586). Hence, we perform a plain error review.

{¶108} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An appellate court is not required to correct plain error, as the Rule states that the court need only "notice" plain error. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Consequently, the Ohio Supreme Court cautions appellate courts to correct plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* quoting *State v. Long*, 53 Ohio St.2d, 91 (1978), paragraph three of the syllabus.

{¶109} In considering whether plain error has been committed, appellate courts must abide by three limitations under Crim.R. 52(B) to correct an error in the absence of an objection. First, we must find an error, meaning a deviation from a legal rule. *Barnes*, 94 Ohio St.3d at 27, citing *State v. Hill*, 92 Ohio St.3d 191, 200 (2001). Second, the error must be a plain error, meaning an "obvious" defect in the proceedings. *Id.*, citing *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001) (citations omitted). And third, the error must have impacted "substantial rights," meaning that the error affected the outcome of the trial. *Id.* (citations omitted). The party asserting plain error bears the burden of showing that an error occurred, the error was plain, and the error affected the outcome of the trial. *State v. Graham*, 2020-Ohio-6700, ¶ 31.

{¶110} Evid.R. 701 provides that, "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful

to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 702 addresses expert testimony and provides that a person testifies as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. . .

{¶111} As Appellee notes, numerous Ohio courts have held that police officers may testify as lay witnesses under Evid.R. 701 regarding cell phone extractions. *State v. Hemmelgarn*, 2019-Ohio-2034 (2d Dist.) is one example. Hemmelgarn was convicted of gross sexual imposition and disseminating matter harmful to juveniles concerning his minor daughter. *Id*. at ¶ 1. His minor daughter testified, as well as an officer who extracted data from the appellant's cell phone. *Id*. at ¶ 6. As the officer began to testify about his training in Cellebrite and various other programs to collect data from cell phones, defense counsel objected, asserting the prosecution needed to qualify the officer as an expert under Evid.R. 702. *Id.* at ¶ 31. The trial court overruled the objection and held that the officer was testifying as a lay witness about extractions and analyses of cell phone data. *Id.* at ¶ 33. The officer testified about the report on the cell phone data extraction, which showed deleted web and browser history, including inferences involving "fathers and daughters." *Id.*

{¶112} The Second District Court of Appeals found no abuse of discretion by the trial court in allowing the officer to testify as a lay witness. *Id*. at ¶ 34. The Court held that the officer's testimony contained facts and not opinions or references about extracting data from the defendant's phone and listing the data in a report. *Id*. The Court held that the only "opinion" the officer offered was that Cellebrite copied data from cell phones, with

which most lay persons were generally familiar that data can be extracted from a cell phone. *Id*. The Court found this did not require a specialized knowledge of Cellebrite and the officer's testimony regarding a report generated showing the content extracted also contained no opinion requiring specialized knowledge, training, or experience. *Id.*

**{¶113}** The *Hemmelgarn* Court noted that its decision was consistent with similar cases decided by the Eighth District Court of Appeals and the Fourth Circuit Court of Appeals. *Hemmelgarn* at ¶ 35, citing *State v. Calhoun*, 2017-Ohio-8488 (8th Dist.); *State v. Shine*, 2018-Ohio-1972 (8th Dist.) and *U.S. v. Chavez-Lopez*, 2019 WL 1562352, *2-3 (4th Cir. Apr. 11, 2019).

**{¶114}** Similarly here, Detective Haueter testified about Cellebrite and other programs used to extract data from electronic devices, such as cell phones. He testified he was trained and certified in data extractions from cell phones, as well as in reading reports generated from applying the extraction software, and the content yielded from the extractions. He possessed personal knowledge of his training and certifications in using Cellebrite and the other extraction and analysis programs. He possessed personal knowledge of applying the software. He did not offer any opinion on the inner workings, accuracy, or effectiveness of the programs or the data extracted from the cell phones with the programs. He testified to his use of the programs to copy data and read the messages extracted from the cell phone and devices with the application software. This was all within Detective Haueter's personal knowledge based on his use of the programs and the general population is familiar with the ability to extract data from cell phones. Accordingly, no expert qualification was necessary.

**{¶115}** Correspondingly, *Daubert* was not implicated because the reliability of the programs was not challenged. And Appellant never filed a motion under *Daubert* challenging the extraction software as unreliable.

**{¶116}** Accordingly, we find that Appellant's second assignment of error lacks merit and is overruled.

**{¶117}** In his third assignment of error, Appellant asserts:

**THERE WAS INSUFFICIENT EVIDENCE IN WHICH TO CONVICT THE DEFENDANT AND THE VERDICT WAS AGAINST THE WEIGHT OF THE**

**EVIDENCE FOR AGGRAVATED MURDER AND INTIMIDATION OF A WITNESS.**

{¶118} Appellant contends that, viewing the evidence in a light most favorable to him, no evidence supported a conviction that there was "prior calculation and design" before the shooting to maintain an aggravated murder conviction. He maintains that no evidence showed: he and R.H. had a strained relationship; he gave any thought or preparation to obtaining a weapon; or the shooting was drawn out as opposed to an "almost instantaneous eruption of events." He cites cases holding that momentary deliberation is insufficient to constitute prior calculation and design. He notes that this is determined on a case-by-case basis as there is no bright-line rule as to timing in order to find prior calculation and design.

{¶119} Concerning intimidation of a witness, Appellant relies on the Ohio Supreme Court case of *State v. Cress*, 2006-Ohio-6501, which he submits is similar to his. He maintains that only Howell provided evidence of intimidation and no evidence existed that any threat was "unlawful" in order to constitute a felony as required under R.C. 2921.04(B).

{¶120} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). Sufficiency is a test of adequacy. *State v. Thompkins*, 1997-Ohio-52 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id*. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Smith* at 113. When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Thorn*, 2018-Ohio-1028, ¶ 34 (7th Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273 (1991) (superseded by state constitutional amendment on other grounds).

{¶121} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the

jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 1997-Ohio-52. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Id.* at 387. In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

**{¶122}** Only when "it is patently apparent that the factfinder lost its way," should an appellate court overturn the jury verdict. *State v. Woullard*, 2004-Ohio-3395, ¶ 81 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins* at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." *State v. Miller*, 2002-Ohio-4931, ¶ 36, quoting Ohio Const., art. IV, § 3(B)(3).

**{¶123}** The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, this Court will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

**{¶124}** Sufficient evidence supports Appellant's conviction for aggravated murder and it is not against the manifest weight of the evidence. It is noted that the entirety of Appellant's brief on this assignment of error is devoted to the sufficiency of the evidence. A judgment may be supported by sufficient evidence and still be against the manifest weight of the evidence. *State v. Bruce*, 2023-Ohio-4719, ¶ 40 (7th Dist.), quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 25.

**{¶125}** Appellant was charged and convicted under R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." "Purposely" is defined by R.C. 2901.22(A) as "the person's specific intention to cause a certain result."

**{¶126}** The statute does not define "prior calculation and design," but the Ohio Supreme Court has held that it is "advance reasoning to formulate the purpose to kill."

*State v. Roberts*, 2025-Ohio-5120, ¶ 144, quoting *State v. Walker*, 2016-Ohio-8295, ¶ 18. The Court explained that since no "bright-line test" exists for "prior calculation and design," cases are determined on their own particular facts and evidence. *Roberts* at ¶ 144, quoting *State v. Taylor*, 1997-Ohio-243, ¶ 28.

{¶127} While instantaneous deliberation is insufficient to constitute "prior calculation and design," a considerable amount of time is not required between devising a plan and committing the murder. *Roberts* at ¶ 145. A few minutes between a person's conception of a plan to kill and his execution of that plan can suffice. *Id.,* quoting *State v. Coley,* 2001-Ohio-1340, ¶ 59. Also sufficient is evidence that the person "went beyond a momentary impulse and show[s] that he was determined to complete a specific course of action." *Roberts* at ¶ 145, quoting *State v. Conway*, 2006-Ohio-791, ¶ 46. The "nature of the attack" can also establish "prior calculation and design." *Roberts* at ¶ 145, quoting *State v. Cassano*, 2002-Ohio-3751, ¶ 81.

{¶128} A court should look at three important but not exclusive considerations to determine if "prior calculation and design" exists:

(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?"

*Roberts* at ¶ 147, quoting *State v. Franklin*, 2002-Ohio-5304, ¶ 56, quoting *Taylor* at ¶ 25 (quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976)).

{¶129} In the instant case, evidence established that R.H. and Appellant knew each other and had a rather strained relationship. As trial testimony established, Appellant was very protective of Ms. Sattler and cared for her, Appellant stated she was his best friend, and Appellant reported to Patrolman Caden Weekley that he was "mad" R.H. was beating Ms. Sattler. (Trial Tr. 268, 280, 351-354, 393, 435, 442, 622, 872). Appellant also became agitated when Patrolman Weekley told him police may bring in Ms. Sattler for questions about the murder. (Trial Tr. 447). Moreover, Savin testified that he and Kessler specifically brought Appellant to Kessler's house to be a threat to Howell. (Trial Tr. 389). A jury could be led to believe that the relationship between Appellant and R.H. was therefore strained.

Case No. 25 CO 0041

{¶130} The evidence also shows Appellant gave thought to and prepared the murder weapon and site in this case and it was more than an instantaneous eruption of events. Appellant walked to Howell's trailer searching for R.H. at least three times on the day of the murder and he became more agitated each time he arrived and was unable to find R.H. (Trial Tr. 279-285, 288-291). He persisted. The final time he pursued R.H. at Howell's trailer, Appellant found him lying on the side of the garage. (Trial Tr. 291). Both Howell and Kessler witnessed Appellant force R.H. to kneel and saw Appellant strike R.H. with the gun. (Trial Tr. 292, 625). They both then watched Appellant pull the trigger and shoot R.H. in the back. (Trial Tr. 292, 625). Neither saw R.H. fight or struggle with Appellant.

{¶131} Appellant brought a gun to the scene while pursuing R.H. and became more agitated at each of the three times he searched for R.H. He trailed R.H. and tracked him down on the third or fourth visit to Howell's trailer. He compelled an unarmed R.H. to his knees. He struck R.H. with the gun. He then shot him. With each pursuit and action, Appellant had time to deliberate. He persisted.

{¶132} Thus, the totality of the evidence shows the shooting was more than an "instantaneous eruption of events." Accordingly, sufficient evidence supported the aggravated murder conviction and it was not against the manifest weight of the evidence.

{¶133} We also reject Appellant's assertion that his conviction for the intimidation of a witness conviction lacks sufficient evidence and is against the manifest weight of the evidence. R.C. 2921.04 provides in relevant part that:

(A) . . . no person shall knowingly attempt to intimidate a witness to a criminal or delinquent act by reason of the person being a witness to that act.

(B) No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder any of the following persons:

. . .

Case No. 25 CO 0041

(2) A witness to a criminal or delinquent act by reason of the person being a witness to that act.

**{¶134}** Appellant asserts the State was required to introduce evidence showing he made an unlawful threat of harm in order to convict him of the felony crime of intimidation of a witness under R.C. 2921.04(B). He submits the State failed to establish that the underlying threat itself violated criminal or civil law, just as the Ohio Supreme Court held in *Cress*, 2006-Ohio-6501, at ¶ 39-42.

**{¶135}** In *Cress* at ¶ 39-42, the Ohio Supreme Court held that both R.C. 2921.04(A) and 2921.04(B) prohibit knowingly intimidating a witness. The Court elaborated:

> "Intimidation" by definition involves the creation of fear in a victim, and the very nature of a threat is the creation of fear of negative consequences for the purpose of influencing behavior. We simply do not discern a meaningful difference between intimidation of a witness and the making of a threat to a witness. Accordingly, both R.C. 2921.04(A) and (B) prohibit the threatening of witnesses.

> An unlawful threat must accordingly connote more than just a threat, i.e., more than just a communication to a person that particular negative consequences will follow should the person not act as the communicator demands. The word "unlawful" in R.C. 2921.04(B) must add substantive meaning, or it is superfluous. Adoption of the state's argument requires us in effect to rewrite R.C. 2921.04(B) by deleting the adjective "unlawful" from the statute. The interpretation of the court of appeals requires us to rewrite the statute by construing the adjective "unlawful" as a modifier of the noun "conduct," a word not even used in the statute. We do not sanction either approach.

> We hold, rather, that the statutory language in R.C. 2921.04(B), proscribing intimidation by an "unlawful threat of harm," is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law. For example, where the making of a threat constitutes the

offense of coercion, in violation of R.C. 2905.12, a misdemeanor, that offense would serve as a predicate offense for the crime of witness intimidation as proscribed by R.C. 2921.04(B), a felony.

*State v. Price*, 2020-Ohio-132, ¶ 29 quoting *Cress* at ¶ 40-42. Thus, the Ohio Supreme Court distinguished the two statutory sections by holding that R.C. 2921.04(B) requires that "the threat itself, not the threatened conduct, must be unlawful." *Price* at ¶ 38.

{¶136} Here, Howell testified that after the shooting, he was chasing down his escaped dog when Appellant approached him, brandished the gun on his hip, and told Howell that if he said anything, he would be next. (Trial Tr. 296). Howell, having just witnessed Appellant shoot R.H., indicated he thought Appellant would shoot him too, so he ran to his sister's house and hid for three hours until she came home. (Trial Tr. 296-298). Howell's sister found Howell partially under her son's bed upstairs and he told her he was hiding. (Trial Tr. 328). She recalled he was scared, anxious, nervous, and skittish. (Trial Tr. 328).

{¶137} As the State observes, Appellant's threat constitutes at least the crime of menacing under R.C. 2902.22(A). The statute provides in relevant part that, "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person." The crime of aggravated menacing could also apply, as R.C. 2903.21(A) provides in relevant part that, "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person." Thus, Appellant's showing of his gun to Howell and threatening him that he could be next if he identified Appellant is an unlawful threat for purposes of intimidation.

{¶138} Accordingly, we find that Appellant's third assignment of error lacks merit relating to both his aggravated murder and intimidation convictions and overrule this assignment of error.

{¶139} In his final assignment of error, Appellant asserts:

**DEFENDANT WAS DENIED A FAIR TRIAL DUE TO THE CUMULATIVE ERRORS IN THE ALLOWANCE OF INADMISSIBLE TESTIMONY.**

{¶140} Appellant contends he did not receive a fair trial because the court made cumulative errors in allowing inadmissible testimony. He asserts he would not have been

convicted had the court properly excluded James Howell's in-court and out-of-court identification of him. He additionally asserts the trial court should have prohibited Detective Haueter from testifying about the cell phone extraction and the resulting phone calls and messages found on his phone.

**{¶141}** Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). Thus, if the court finds various single errors to be harmless error, we may reverse based upon the effect of all of these harmless errors together. *State v. Donkers,* 2007-Ohio-1557, ¶ 202 (11th Dist.).

**{¶142}** A cumulative error analysis is not necessary because we find no merit to any of Appellant's assignments of error. However, even if the trial court erred as Appellant alleges, sufficient evidence still existed upon which to convict Appellant of aggravated murder. Kessler and Howell witnessed the shooting and identified Appellant and Howell testified about the shooting and Appellant's threats to him. Appellant himself testified contrary to the other witnesses, and the inmate in the jail at the same time as Appellant testified Appellant offered him money and drugs to identify Howell as the perpetrator. Patrolman Caden Weekley also testified about Appellant's contradictory statements that he did not know Howell, Kessler, or R.H., and his later admission that he did.

**{¶143}** Accordingly, we find that Appellant's fourth assignment of error lacks merit and is overruled.

**{¶144}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, P.J., concurs.

Dickey, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**